IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff

v.

SHAO LIN HUANG,

Defendant

CRIMINAL 05-0065 (CCC)

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

I.  FACTUAL AND PROCEDURAL BACKGROUND

On March 2, 2005, the defendant was indicted by a grand jury. The indictment consists of two counts. In the first count, the defendant is charged with being an alien against whom a final order of deportation is outstanding, in knowingly and willfully failing and refusing to depart from the United States within a period of ninety (90) days from the date of the final order of removal under administrative processes, to wit, pursuant to a final order of an immigration court in Guaynabo, Puerto Rico, dated August 24, 1998, granting voluntary departure until May 24, 1999, with an alternate order of deportation, in violation of 8 U.S.C. § 1253. (Indictment, Docket No. 10.) In the second count, the defendant is indicted for violations of 18 U.S.C. § 922(g). (Id.) Specifically, the indictment charges the defendant with knowingly possessing in or affecting commerce, any firearm or ammunition or receiving any firearm or ammunition, as those terms are defined in 18 U.S.C. § 921(a)(3) and (a)(17)(A), that is a .380 caliber Beretta pistol, Model

CRIMINAL 05-0065 (CCC)                    2

84F, serial number E38674Y, a magazine loaded with seven (7) rounds of .380 caliber Ranier ammunition, fifty (50) rounds of .9mm caliber CCI ammunition and a .357 caliber Smith & Wesson revolver, Model 66 handgun, serial number BNY5615 and fifty-six (56) rounds of .357 CCI ammunition, which had been shipped and transported in interstate and foreign commerce. (Id.)

On April 18, 2005, the defendant filed a motion to suppress the evidence seized from his home. (Docket No. 19.) The United States filed an opposition to the motion to suppress on April 29, 2005. (Docket No. 22.) The government's version of the facts is as follows. The defendant is a citizen of the People's Republic of China who entered the United States in 1991. He was granted voluntary departure on August 24, 1998 and agreed to leave by May 24, 1999. He failed to leave. The defendant was located at his residence on February 8, 2005 and arrested. United States Immigration and Customs Enforcement (hereinafter "ICE") agents arrived at the defendant's home where he answered the door and allowed them into his house. He was asked for his passport and identification. He then informed the agents that the documents were in his bedroom and consented to an agent's searching the room in order to find them. The defendant signed a consent to search form at 9:40 a.m. An agent noticed an empty gun holster in a drawer and asked the defendant whether there were any weapons in the house. The agents then located a .357 magnum handgun and ammunition in a locked drawer as well as a .380 Beretta pistol in the

CRIMINAL 05-0065 (CCC)                3

closet. The defendant was then transported to the immigration office. His legal status and the ownership of the handguns are not in issue.

As might be expected, in his motion to suppress the defendant gives a slightly different version of the facts as they transpired on February 8, 2005. He claims that at approximately 9:30 a.m. he was at his residence in Guaynabo, Puerto Rico, when he heard voices outside of his home. He decided to investigate and as he walked to his door and through a gate adjacent to his door, he saw a man dressed in civilian clothing. The man allegedly took a bill from the mailbox with defendant's name on it and asked whether the defendant was Shao Lin Huang. The defendant replied in the affirmative. At that time, the man, who was an agent, told the defendant to open the outer gate of the residence. The defendant complied and immediately thereafter he was handcuffed and placed under arrest. The defendant stresses that he was arrested outside of his residence.

According to defendant's version of the facts, an agent Estrada asked him where his passport was. The defendant responded that it was inside his home. Agent Estrada then proceeded, together with another agent and without defendant's consent, to enter the residence. Meanwhile, the defendant remained handcuffed outside the residence with an agent Martínez. Defendant alleges that he was subsequently brought into his bedroom where he observed the agents conducting a search. While looking inside a drawer of a desk in defendant's bedroom, agent Estrada observed an empty gun holster. At the same time he was attempting to

CRIMINAL 05-0065 (CCC)                    4

break the lock of a second drawer. The defendant instructed agent Estrada as to which key opened the drawer. Agent Estrada already had possession of his keys.

Agent Estrada located a firearm in the locked drawer and immediately asked the defendant whether there were any other weapons in the house. The defendant answered that there was another one in the closet. The second firearm was also seized. The defendant alleges that he had a permit for both firearms although the same had expired. He also claims that the agents continued to search the house even though they had already located defendant's passport. They searched defendant's bedroom and the other bedroom in the house. They also searched the bathroom, the kitchen and the backyard. Finally, after the search that revealed both firearms and a minute amount of marijuana, the agents took defendant to ICE's offices in Guaynabo. According to defendant, the agents presented him, for the first time, with a consent to search form which he signed. He was interviewed by Special Agent Fabián Rosero and provided a statement admitting that he was illegally in the United States.

Hearings were held on May 23 and June 22, 2005. Deportation Officer Rafael Estrada of ICE testified that on February 8, 2005, he together with other agents went to 369 Escorial Avenue in Guaynabo to look for the defendant. (See Exs. B, G.) They arrived at about 9:30 a.m. and one of the agents knocked on the iron/wood gate which was about five feet in front of the entrance to the house. (See Ex. D.) After two or three minutes, the defendant came outside to the gate, where he was placed

CRIMINAL 05-0065 (CCC)                5

under arrest after opening the same. (See Ex. D.) His hands were cuffed behind his back. He was then asked in Spanish for travel documents and was asked for his name. The defendant, in heavily accented Spanish, said that the travel documents were in his bedroom. The agents entered and made a safety sweep of the house. (See Ex. F.) There was nobody else in the house. The agents went into the bedroom and searched a set of drawers since the defendant thought the documents were in the drawers. There was an empty holster in a drawer and an agent asked the defendant if there was a weapon. He said there were two. The drawers in the dresser were locked and then the defendant produced the keys, at which time the agents got a consent to search form, removed his handcuffs, and he signed the document. He was read the form and seemed to understand the same. Two weapons were found and seized as a result of the search. The travel documents were found after the weapons were found. The defendant was then taken to the ICE offices in San Patricio and processed. He was read his rights with the use of an I-214 form which was read through a Cantonese interpreter in the ICE New York office, this due to the possibility that he would be brought up on charges. He was then questioned.

ICE Agent José Fuentes testified that he went to the defendant's house on the previous day and saw an envelope in the mailbox with the defendant's name on it. (See Ex. D.) A Chinese man from the second floor of the house said that the defendant was working. The agent then left. On the following day, the agent

CRIMINAL 05-0065 (CCC)                    6

returned, parking his car in the driveway area.  (See Ex. G.)  Agent Estrada and Agent Fuentes wore bulletproof ICE and police vests when Agent Fuentes knocked on the wooden door.  The defendant came out.  He was then handcuffed and was not free to go.  When the defendant was arrested, he was asked if he had documents inside, in Spanish.  The agent had no difficulty communicating with the defendant in Spanish and to understand his heavily accent Spanish.  For the agents' safety, permission was asked to search the house.  The defendant consented for the agents to get his travel documents and to search a dresser.  Three agents were with the defendant during the search of the bedroom.  The dresser had a locked bottom drawer.  The defendant was asked if he had any weapons and when he said that he did, the agents asked for a key which the defendant produced from somewhere and gave to Agent Estrada.  The consent form was signed after the first weapon was found in the locked drawer.  The search then continued.  Travel documents and a small amount of marijuana were also found.  In total, two weapons were found.

The defendant Shao Lin Huang testified on June 22, 2005 through the services of a Cantonese interpreter.  He is 35 years old and has lived in Puerto Rico for 14 years.  He left China at the age of 17, is married and has three children who were born here.  He works as a cook in a Chinese restaurant and works about six days a week, 10 hours a day.  His days off vary.  At work, he speaks Chinese.

The defendant related that on February 8, 2005 he was sleeping in his bedroom sometime after 9:00 a.m. when he heard a loud noise outside.  He went to

CRIMINAL 05-0065 (CCC)                              7

the living room, then passed through the first metal door of his home, opened the wooden door (both are attached to the same door frame) (see Ex. F), and saw a man wearing a suit outside the outside gate. The defendant said that the man (Agent Estrada) did not identify himself. As the man looked at the defendant, the man reached into the mailbox at the left corner of the entranceway and pulled out a piece of mail, asking him twice if he was Shao Lin Huang. (See Ex. D.) The defendant responded yes. The man then said, "Please open the door; I need to talk to you." The defendant went to get a key to open the (outside) gate, which he did open. (See Ex. D.) The man gave a signal and two policemen in uniform came out of an unmarked SUV parked on the sidewalk across the street and rushed toward them. As soon as the defendant had unlocked the gate, Agent Estrada pushed in the gate, grabbed him, and told him he was under arrest. The three agents put him in handcuffs and Agent Estrada pushed him beyond the outside gate, toward the sidewalk. (See Exs. C, D, G.) He was arrested on the balcony, a common area between his door and the outside gate to the house. (See Exs. C, E.) The defendant was asked if he knew King-fu. Officer Estrada handed the defendant to Officer Martínez who was going to put him in the car which was parked in the parking areas in front of the house. (See Ex. G.) The officer then went to lock the gate, but Officer Estrada grabbed the keys and locked the gate. Officer Estrada then returned to the car and asked the defendant for his passport. The defendant said it was in the home at which time Agent Estrada said they were going to search it. Agent Estrada

CRIMINAL 05-0065 (CCC)            8

then unlocked the gate, and went in. Agent Martínez held on to the defendant who was still handcuffed. The defendant did not give consent for anyone to enter his house or his room. Agent Ríos also entered the house. The agents were in the house over an hour. Agents Fuentes and Fabián from ATF arrived during the time the other agents were in the house. The defendant was brought into the bedroom. Again, no one had asked him for permission to enter the house or bedroom. Officer Estrada searched the defendant's desk. (See Exs. I, J.) Another agent was in the closet going through the defendant's pants. The defendant was still handcuffed.[1] Officer Martínez asked if there were weapons. He asked again, angry. There were five agents in the house at the time. Fearful for his life, the defendant said that a weapon[2] was in a locked drawer.[3] Agent Estrada unlocked the drawer and yelled to other agents that he found it. When asked about another gun, the defendant said that it was on the top shelf of the closet. (See Exs. M, N.) It was then retrieved. The weapons were taken away, the defendant's passport was located, and the agents wanted to locate contraband goods since they found a small amount of marijuana in a garment pocket in his room. All of the house was searched. On the way out, the agents asked for the keys to a parked car and to a gate leading to the upstairs of the

---

[1] From the moment the handcuffs were put on, they remained on until the defendant went to the offices of ICE in San Patricio.

[2] Both weapons that were ultimately recovered were registered in the name of the defendant.

[3] The defendant lives with three sons of school age; thus the locked drawer.

CRIMINAL 05-0065 (CCC)             9

house. The defendant said the car was not his and that he did not have the keys to the upstairs. The defendant's car was searched thoroughly and a weapons license was found. The defendant was transported to the ICE office at San Patricio where an interpreter was requested.[4] The interpreter that was contacted performed the services through the telephone and was difficult to understand since the interpreter spoke Cantonese and the defendant speaks a Chinese language other than Cantonese, phonetically (Toisanese).[5] He was explained that ICE had put him under arrest. He asked to make a phone call to his family and to school (where his sons attend). Agent Estrada said he could not. When told by Agent Estrada that he was arrested on a warrant, he was given a paper to sign by Agent Estrada and he signed the same. (Ex. 1.) He denied signing the document at his home.

At ICE, his rights were read to him. This was the first time his rights were informed to him. The defendant never told any of the agents that he did not understand them. At the house, he was not asked if someone else was inside, or lived there. He was never asked if they could enter the home, and he was never told that he had the right for them not to search the house. When the defendant reentered the home, a weapons holster had already been found. After a weapon was

---

[4]The defendant testified that he did not read English and knew just a little Spanish. He explained that when he spoke with his attorney, it was slowly with repetition, and explanations.

[5]The interpreter used at the evidentiary hearing spoke Cantonese and apparently there were minimal difficulties in translating the questions and testimony during the hearing.

CRIMINAL 05-0065 (CCC)                    10

found, he was asked for his passport. He never told the agents not to search or to stop searching. No rights were explained to him at the house. The defendant cooperated with the agents in his house. The defendant acknowledged signing an advice of rights form at ICE. The time on the form is 10:55 a.m.

## II. DISCUSSION

The defendant advances several arguments in support of his motion to suppress. First, he claims that he has standing to challenge the search that revealed the firearms in this case since he has a reasonable expectation of privacy in the home he rents. Second, it is defendant's contention that the government cannot meet its burden of showing that the warrantless search of defendant's home was conducted pursuant to one of the recognized exceptions to the Fourth Amendment's warrant requirement. Specifically, the defendant claims that the search at issue was not authorized as a search incident to an arrest because the defendant was arrested outside his home and such a search to be valid must be confined to the immediate vicinity of the arrest. The defendant further argues that the government cannot demonstrate that the search was conducted with his consent. According to the defendant, and notwithstanding the time that appears on the consent form, the agents obtained consent after the search had already taken place. The defendant thus moves for suppression of the two firearms seized from his home as fruits of the poisonous tree.

CRIMINAL 05-0065 (CCC)                              11

In its terse "Response in Opposition to Defendant's Motion to Suppress," the government adduces that there is no basis to suppress the evidence because the facts of this case indicate that defendant validly consented to the search. In addition, the government contends that the search was validly conducted as a search incident to an arrest inasmuch as the statements of the agents demonstrate that the defendant was arrested at his residence and the search conducted in his presence and with his assistance. The government maintains that the items recovered from defendant's residence were properly seized by the federal agents.

    A.  Search Incident to an Arrest

A warrantless search involving an intrusion into someone's home is presumed unreasonable under the Fourth Amendment. Groh v. Ramírez, 540 U.S. 551, 559 (2004); United States v. Tibolt, 72 F.3d 965, 968 (1st Cir. 1995). However, a warrantless search may be conducted if an exception to the search warrant requirement exists. A search incident to an arrest has been recognized by the courts as a well settled exception to the search warrant requirement. United States v. Robinson, 414 U.S. 218, 224 (1973); United States v. Doward, 41 F.3d 789, 791 (1st Cir. 1994). The Supreme Court has held that a search may be incident to an arrest "only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest." Shipley v. California, 395 U.S. 818, 819 (1969) (quoting Stoner v. California, 376 U.S. 483, 486 (1964)). Based on the above, it has been held that in order to search a house "as incident to an arrest, [the] arrest must

CRIMINAL 05-0065 (CCC)                    12

take place inside the house, ... not somewhere outside--whether two blocks away, ... twenty feet away, ... or on the sidewalk near the front steps." Vale v. Louisiana, 399 U.S. 30, 34 (1969) (internal citations omitted). Simply put, "the immediate vicinity of the arrest" does not include the interior of the home if the person is arrested outside the premises of the residence. Id. at 33-34 (quoting Shipley v. California, 395 U.S. at 819) (emphasis provided); United States v. Wilson, 36 F.3d 205, 208 (1st Cir. 1994).

    B.  Protective Sweep

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. Moreover, this search "must be 'narrowly confined to a cursory visual inspection of those places in which a person might be hiding' ... and can last 'no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises....'" United States v. Paradis, 351 F.3d 21, 29 (1st Cir. 2003) (quoting Maryland v. Buie, 494 U.S. 325, 335-36 (1990)). A protective sweep does not entail a full search of the premises; any items seized during the protective sweep must be in plain view. United States v. Luna-Rojas, 28 F. Supp. 2d 54, 61 (D.P.R. 1998). "[A] 'protective sweep' is 'no more lightly taken than any other instance where the government seeks to justify an unwarranted search....'" United States v. Gerry, 845 F.2d 34, 36 (1st Cir. 1988) (quoting United States v. Hatcher, 680 F.2d 438, 443 (6th Cir. 1982)).

CRIMINAL 05-0065 (CCC)                    13

### C. Consent to Search

When the issue of consent is present, the government bears the burden of showing that consent was validly obtained. See United States v. Laine, 270 F.3d 71, 75 (1st Cir. 2001) (citing Florida v. Royer, 460 U.S. 491, 497 (1983)). Again, it is firmly settled that a warrantless search is per se unreasonable "subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Consent to search is another one of the recognized and specifically established exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 220 (1973). "[A] search pursuant to consent ... properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity." Id. at 228. So long as the consent is given voluntary, i.e., "the product of an essentially free and unconstrained choice[,]" a search must be upheld. Id. at 225 (citations omitted); see also United States v. Marshall, 348 F.3d 281, 285-86 (1st Cir. 2003); United States v. Weidul, 325 F.3d 50, 53 (1st Cir. 2003). In examining the voluntariness of the consent, the court must look at the totality of the circumstances. United States v. Luciano, 329 F.3d 1, 7 (1st Cir. 2003); United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999); United States v. Barnett, 989 F.2d 546, 554-55 (1st Cir. 1993). The court must pay close attention to individualized factors bearing on the vulnerability of the consenting party such as "age, education, experience, intelligence, and knowledge of the right to withhold consent." Id. at 555.

CRIMINAL 05-0065 (CCC) 14

Furthermore, courts have held that a search can not be justified as lawful when consent has been obtained following government misconduct. <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548 (1968); <u>see also</u> <u>United States v. López-Arias</u>, 344 F.3d 623, 629 (6th Cir. 2003); <u>United States v. Benezario</u>, 339 F. Supp. 2d 361, 368 (D.P.R. 2004) (holding that "[a]n otherwise valid consent may not be sufficient to render a search constitutional if it follows from prior government misconduct. In such circumstances, the unlawful conduct 'taints' the later-given consent.")

### III.  ANALYSIS

I review the evidence, with its consistencies and inconsistencies, and consider the totality of the circumstances. It becomes pellucidly clear that the house from which the defendant exited did not require that the agents conduct a security sweep since the arrest had been conducted on the threshold of the common area of the gate which separated the front steps of the house with the "balcony" which represents a common area through which the upstair tenant and the tenant could transit. (See Ex. C.) It is apparent from the evidence at the hearing that there was not even a hint of danger to the agents outside of the house for them to conduct a security sweep. <u>United States v. Carter</u>, 360 F.3d 1235, 1242-43 (10th Cir. 2004) (finding unreasonable the agents' entry into the backyard and garage of the defendant where the defendant was arrested outside his home and the agent could not point to any articulable facts from which it could be reasonably inferred that the area swept harbored an individual presenting a danger to them). One agent testified that he

CRIMINAL 05-0065 (CCC)                    15

sought permission to conduct such a search. The purpose of the security sweep precisely belies the need for such a request. Indeed, if the arrest were conducted inside the house, the need for a sweep would be more apparent. Concerning the location of the arrest, whether within the curtilage or outside of the same, it is clear that within the immediate vicinity of the arrest of the defendant, who was physically taken into custody by taking him out of the outer gate during the arrest procedure, there was no need to make a search of the house incident to arrest, and less a need to make a security sweep for the benefit of the agents. (See Ex. C.) The request of a defendant in custody for travel documents should have been replaced for a request for search warrant and securing the area while such request was gotten, during which time, in a more serene fashion, the law enforcement agents might have requested a consent with the defendant's knowledge that he had an option to refuse. See United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989) (explaining that one of the factors to be considered in determining he voluntariness of the consent given is the consenting party's knowledge of his or her right to refuse consent). There is no evidence aside from a signed consent to search form[6] which is surrounded by at least some controversy. A handcuffed defendant, the fact that the search was already on when the written consent was acquired, and the colorable language barrier also weigh against a finding of a valid consent to search.

---

[6] While strong evidence of consent, such a signed form is not conclusive of such consent. One must still look at the totality of the circumstances in making a determination as to voluntariness.

CRIMINAL 05-0065 (CCC)　　　　　　16

The consent issue is disposed of fairly summarily by the government. However, the evidence of record reflects that if there was some type of consent gained from the defendant, it was, if anything, devoid of his knowledge to prohibit such search or to control such consent. The evidence reflects that the action was fast, and that there was no time for reflective pause, or some explanation to the defendant of any rights he may have been giving up.

## IV. CONCLUSION

The arrest of the defendant pursuant to a warrant was valid. The arrest occurred in a location where a search of the immediate vicinity did not require or welcome a protective sweep of the inside of the rented apartment where the defendant lived. The weighing of the evidence of consent preponderates toward a finding that any consent if given was not freely and voluntarily given, with knowledge of the consequences and of the right to refuse. It is my recommendation that defendant's motion to suppress be GRANTED.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate review. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d

CRIMINAL 05-0065 (CCC)                17

22, 30-31 (1st Cir. 1992); <u>Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.</u>, 840 F.2d 985 (1st Cir. 1988); <u>Borden v. Sec'y of Health & Human Servs.</u>, 836 F.2d 4, 6 (1st Cir. 1987); <u>Scott v. Schweiker</u>, 702 F.2d 13, 14 (1st Cir. 1983); <u>United States v. Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this 28th day of June, 2005.

                                        S/ JUSTO ARENAS
                                Chief United States Magistrate Judge